UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MIDLAND ACADEMY OF ADVANCED
AND CREATIVE STUDIES, a Michigan
Nonprofit Corporation, and MIDLAND
CHARTER INITIATIVE, a Michigan
Nonprofit Corporation

       Plaintiffs,                          Case No. 17-cv-13790
                                         Honorable Thomas L. Ludington

v.

HAMILTON MUTUAL INSURANCE
COMPANY, an Iowa Corporation

       Defendant,

_____/

## ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, HOLDING PLAINTIFF'S MOTION FOR APPRAISAL IN ABEYANCE AND DIRECTING SUPPLEMENTAL BRIEFING

Plaintiff Midland Academy of Advanced and Creative Studies (Midland) is a Charter School located in Midland, Michigan. Plaintiff Midland Charter Initiative is Midland Academy's management company. Midland is insured under a policy issued by Defendant Hamilton Mutual Insurance Company (Hamilton). This litigation arises out of a car accident that occurred at the Midland Academy and the parties' subsequent dispute over insurance coverage. Following the accident, the parties communicated over a period of several months regarding the alleged loss, and Midland submitted Sworn Statements in Proof of Loss (SSPOLs). Hamilton ultimately paid Midland approximately $186,400.54.

Thereafter, Midland continued to seek additional compensation for various alleged losses including time spent by teachers to inventory the loss, missing or damaged equipment, and lost income due to students withdrawing from school following the accident. Hamilton not only

disagreed as to whether these losses were covered under the policy language, but also as to whether student attrition was causally related to the accident.

The parties were unable to resolve the dispute. On November 1, 2017, Plaintiffs filed a complaint in the Circuit Court for the County of Midland. Compl., ECF No. 1, Ex. A. Plaintiffs allege that they "have suffered losses which have not been properly adjusted or paid . . . including but not limited to adjustment and payment for certain building replacement costs, contents, costs of taking inventory, business income, extended business income, and extra expenses as provided for by the policy." *Id.* ¶ 11. The complaint contains two counts. Count one seeks Declaratory Relief that Defendant has "incorrectly and arbitrarily interpreted its policy language for period of restoration and suspension of operations, among other language in a manner which is contrary to clear and unambiguous terms." *Id.* ¶ 21. Count II alleges that Defendant breached the contract by incorrectly interpreting the insurance policy and failing to pay the claims presented. *Id.* ¶ 26–28.

Defendant removed the case to this Court on November 22, 2017. ECF No. 1. After approximately eight months of discovery, Hamilton moved for summary judgment on September 5, 2018. ECF No. 9. Midland opposes the motion (ECF No. 15) and separately filed a motion for appraisal. ECF No. 19. To the extent any covered loss was incurred (which is disputed), the parties disagree about how to calculate net income and thus the existence of a loss and its amount. Accordingly, Midland's motion for appraisal seeks to have the net income determined by an independent appraiser(s) pursuant to the policy language. Hamilton opposes the motion for appraisal. ECF No. 21.

**I**.

On November 3, 2015, a vehicle drove into the Midland Academy school building causing structural damage and other alleged loss. Midland submitted SSPOLs to EMC Insurance Companies (EMC), Hamilton's parent company, which are variously referred to in the record as "revised" SSPOLs and a "final" SSPOL.

On November 10, 2015, EMC sent a letter to Midland's business manager (Tracy Anderson) which reads, in pertinent part:

> Hamilton Mutual Insurance Company, a subsidiary of EMC Insurance Companies, acknowledges receipt of notification of your loss and with this letter informs you of the necessary actions you must take to present your claim . . . You are requested to send, to the attention of the undersigned, information concerning your loss on the enclosed form entitled, "Sworn Statement in Proof of Loss." You must return a completed Sworn Statement in Proof of Loss to the undersigned within 60 days after our request, but no later than January 15, 2016 otherwise, your claim cannot receive further consideration.

ECF No. 9-13.

It is not clear when Midland submitted its initial SSPOL to EMC (which was apparently due January 15, 2016). The record furnished by the parties contains email correspondence dated March 31, 2016 between EMC's claims adjuster (Lisa Singer) and Midland's business manager (Tracy Anderson) which appears to reflect that EMC had received some documentation (perhaps an SSPOL) from Midland concerning the alleged loss. On March 31, Ms. Singer wrote as follows: "Tracy, We need to agree on a cost for the hours spent to separate the damaged property and the price [for] it. Did you keep track of hours for this? Can you send me your breakdown so I can include this portion [in] the settlement? Thanks, Lisa." ECF No. 9-21. Tracy Anderson then responded:

Lisa, here is what I have. Let me know if there is anything else needed.[1] However, Kathryn has some concerns:
1. Compensation for the building being closed for 11/3-11/5.
2. Student Displacement costs
3. Hours spent over the entire project.
4. MCI policy activation to cover these types of things?
Any information on this would be helpful.

*Id.* Lisa Singer then responded as follows:

Tracy, Thank you for the documentation.[2] As for the questions that Kathryn has:
1. The school suffered no loss of income due to the school being closed for two days so there is no compensation for the building closure.
2. Servpro and your staff moved the students from one class room to another on the property. Servpro has already been paid for their involvement in moving the location of the classroom. If you have additional staff hours used to help move, please send those to me as that portion would be covered.
3. The hours Kathryn spent working with the contractor during the repair process is not a covered expense under the policy. I agreed with the scope of work and cost of work with the general contractor you hired to complete the work. There were many additional hours spent by both Kathryn and the general contractor due to upgrades and changes that Kathryn made to the original scope of work. The insured working with the general contractor is a normal cost of having an insurance claim and is not covered as an extra expense under your policy.
4. You would need to speak with your agent concerning those type of coverages.

*Id.* On April 7, 2016, Lisa Singer sent Tracy Anderson the following email:

Tracy, I have attached a revised statement of loss[3] and the final proof of loss. You will see that I have added back in your deductible, so your payment will be 1,000 more. Please have the proof of loss signed and notarized. I will issue final payments when I receive the proof of loss.

ECF No. 9-17. Based on this email, it appears EMC's adjuster, Lisa Singer, prepared the SSPOL on Midland's behalf and then sent it to Midland to sign, notarize and return, as opposed to Midland completing the SSPOL on its own. Midland submitted the SSPOL to EMC on April 15, 2016. ECF No. 9-18. The April SSPOL claims $170,387.08 in replacement costs for damages to the "Building" and "BPP" (Business Personal Property). *Id.*

---

[1] The email appears to reference an attachment. The attachment was not furnished to the Court.
[2] Again, it's unclear what documentation Tracy provided.
[3] Again, the original statement of loss is not in the record. Thus, it is unclear what revisions were made.

On May 24, 2016, Tracy Anderson sent Lisa Singer an email containing a table of hours representing allegedly compensable time for employee labor. ECF No. 9-19. On May 26, 2016, Lisa Singer sent a response email with the subject line "finalizing claim," which reads as follows:

> Tracy, I have added the additional cost of roofing repairs, labor hours and 3 Rivers supervision, debris removal costs to the statement of loss. This also includes the additional cost from Servepro for business personal property. Please review and if the statement of loss is accurate, have the proof of loss signed and notarized. You can fax or email the signed and notarized proof to me. Thank you, Lisa.

*Id.*

On June 17, 2016, Plaintiffs submitted a Sworn Statement in Proof of Loss (SSPOL) to EMC claiming $186,400.54 in replacement costs for damage to the "Building" and "BPP" (Business Personal Property). ECF No. 9-3. Sometime thereafter, EMC paid the claim for $186,400.54 (the exact date is not stated in the record). On July 12, 2016, EMC submitted a subrogation claim to State Farm, the driver's insurance company, in an amount of $186,400.54, which was paid on August 15, 2016. ECF Nos. 9-15–9-16.

It appears that Midland continued to contact EMC regarding additional coverage after the payment was completed. A September 7, 2016 letter to Midland from EMC reads as follows:

> Dear Ms. Shick, We have completed our adjustment of the claim that was submitted to Hamilton Mutual Insurance Company, a subsidiary of EMC Insurance Companies, for loss of income due to the vehicle hitting the building. Our investigation revealed that the school had unused classrooms when the building loss occurred on November 3, 2015. The classroom that was damaged was moved to an unused classroom so that class could continue as usual. Work was completed to the building on or about April 7, 2016. All of the covered damages that resulted to the building, business personal property, cost of taking inventory and the cost to move the classroom have been paid in full. We received and accepted the proof of loss for the entire claim on June 17, 2016. This Sworn Statement and Proof of Loss made no claim of Business Income [loss] being incurred. Per our most recent conversations, you are now claiming that due to this loss, your enrollment is down for the school term of 2016-2017 and you would

like to file a claim for loss of income due to low enrollment. You are also asking for reimbursement for your time spent coordinating the repairs. We have reviewed your policy to determine if coverage applies for the low enrollment. You are claiming low enrollment, and the associated loss of income, for the 2016-2017 school year due to the loss that occurred in November 2015. Work on the damaged classroom was completed on April 7, 2016. Unfortunately, the school did not suffer a loss of income claim during the period of restoration. Since no students withdrew from the school during the repairs specifically because of the accident, there was no business income loss. We have reviewed coverage under the Extended Business Income also. Since the school did not suffer a loss of income claim during the period of restoration, the Extended Business Income portion of the policy does not apply.

ECF No. 9-4.

Thereafter, the following email exchange took place between September 14-21, 2016:

From: Tracy Anderson
Date: Wed. Sep. 14, 2016 at 10:35am
Subject: TMA Claim
To: Lisa Singer

Lisa, the teacher, Carole Crary, has been continuing to unpack boxes and yesterday discovered that some of the cords needed to hook her equipment back up are not there. Not sure if they were tossed out during the initial crash or what happened. The cables totaled $31.64. Can you approve this claim? Also, probably of greater concern is that her phone is missing. I am not sure how to handle this as this system is extremely old and I have been unsuccessful in replacing phones in the past. Please advise how to handle this.

On 9/20/2016 3:01 PM, Tracy Anderson wrote:

Lisa, I wanted to follow up on the below email. One of my major concerns is that our phone is also our communication system in the event there is an emergency situation. We do not have a PA system. Please let me know how I should proceed.

On Wed. Sep 21, 2016 at 2:36 PM, Lisa L Singer wrote:

Tracy, You have already submitted a final proof of loss for the damages that were sustained due to the above loss and that concludes your claim. Those items should have been inspected prior to you submitting the final proof of loss for this claim. I am sorry. There is nothing further that we can do for you.

On September 21, 2016 3:36 PM, Tracy Anderson wrote:

What is indicating that I have signed a final Loss Statement? When we talked initially you told me that the Loss Statement was just so that funds could be released and that even if a year had passed and something else had been discovered the claim could be reopened.

On Wed, Sep 21, 2016 at 3:41 PM, Lisa L. Singer wrote:

Tracy, Prior to sending your final proof of loss, I asked if everything had been completed, including setting up the classroom that was affected. We paid for unpacking and additional cleaning fees for that room. You advised that all work was complete. I am sorry, but the final proof of loss has already been received for this claim.

On 9/21/2016 3:47 PM, Tracy Anderson wrote:

Where does it say that it is final on the proof of loss?

On Sept. 21, 2016 3:51 PM, Lisa L Singer wrote:

The email that the final proof of loss was attached too, explained that I needed figures to finalize your claim. The proof of loss also states the total amount that you are claiming.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). "The party opposing summary judgment cannot rest on its pleading or allegations, to prevail, they must present material evidence in support of their allegations." *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007) (citing *Celotex Corp v. Catrett*, 477 U.S. 317 (1986)). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant

and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

### III.

### A.

Hamilton first argues that it is entitled to summary judgment because "having submitted a SSPOL and accepted payment pursuant to the SSPOL, Midland's claims are barred by accord and satisfaction as well as by the terms of the HMIC Policy." Mot. at 10, ECF No. 9. "An accord and satisfaction may be effected by payment of less than the amount which is claimed if the payment is tendered by the debtor in full settlement and satisfaction of the claim." *Fuller v. Integrated Metal Technology, Inc.*, 154 Mich. App. 601, 607–08 (1986). "The tender must be accompanied by an explicit and clear condition that, if the payment is accepted, it is accepted in discharge of the whole claim." *In re MCI Telecommunications Complaint*, 255 Mich. App. 361, 367 (2003).

Hamilton makes much of the fact that the adjuster's March 31 email to Midland's business manager requested a "final proof of loss" after which Hamilton would issue "final payment." ECF No. 9-17. This is far from an "explicit and clear condition that, if the payment is accepted, it is accepted in discharge of the whole claim." *In re MCI*, 255 Mich. App. at 367. Nothing on the document itself indicated that it was a "final" SSPOL, nor has Hamilton produced a payment instrument tendered in full satisfaction of all claims. Hamilton cites no authority supporting the notion that the adjuster's use of the word "final" during her email communication is sufficient to give rise to an accord and satisfaction.

Moreover, it is apparent that the "final" SSPOL requested on March 31, and executed on April 16, was not in fact the "final" SSPOL. No payment was issued in response to the April 16

SSPOL which sought $170,387.08. ECF No. 9-18. Another SSPOL was requested on May 26, 2016, and was executed on June 17, 2016, seeking $186,400.54. ECF Nos., 9-3, 9-19. The May 26, 2016 email requesting an updated SSPOL contains the subject line "finalizing claim." The content of that email does not, however, describe the SSPOL as a "final proof of loss" nor does it describe the forthcoming payment as a "final payment." ECF No. 9-19. Nor has Hamilton produced a payment instrument tendered in full satisfaction of all claims.

In short, even if the subjective intent of Hamilton's adjuster was to communicate to Midland that payment on the claim would fully and finally resolve all of Midland's claims, that subjective intent was not explicitly communicated.

Hamilton also argues that, even if the adjuster did not explicitly convey an express condition, "one, such as Midland who accepts a payment, even without initially agreeing that it constitutes an accord, but then retains the funds despite learning that they were tendered with that condition, thereby accepts the accord." Mot. at 12. Hamilton does not, however, explain when or under what circumstances Midland learned that the funds were tendered as an accord, nor does Hamilton identify any specific evidence to support this assertion.

Hamilton may be referring to the correspondence between Ms. Singer and Ms. Anderson between September 20-21, in which Ms. Anderson inquired about coverage for equipment cords and a phone system. ECF No. 9-14. Ms. Singer responded: "Tracy, you have already submitted a final proof of loss for the damages that were sustained due to the above loss and that concludes your claim. Those items should have been inspected prior to you submitt[ing] the final proof of loss for this claim." *Id.* However, much like the email correspondence discussed above, the reference in the September email correspondence to a "final proof of loss" does not establish the existence of an accord, as it does not contain an express condition that, if the money is retained,

the claim is discharged. Rather, the email does nothing more than express Ms. Singer's opinion that Midland is not permitted to submit multiple SSPOLs.

Hamilton also argues that it detrimentally relied on the June 2016 SSPOL as a final SSPOL when it settled its subrogation claim with the driver's insurer for $186,400.54, the amount paid to Midland. This corroborates Hamilton's belief that the SSPOL was a final statement of loss by Midland. Hamilton's subjective belief does not, however, constitute an accord and satisfaction, nor does it justify Hamilton's "detrimental reliance." Hamilton has furnished no evidence that it tendered payment in full satisfaction of all claims, nor has it furnished evidence that Midland represented the SSPOL as a final statement of loss or otherwise took action that would justify Hamilton's reliance.

**B.**

Next, Hamilton argues that it is entitled to summary judgment because Midland has not satisfied the policy's condition precedent to bringing suit against HMIC. The policy requires that Midland provide Hamilton with a SSPOL within 60 days after it is requested by Hamilton. *See* Loss Conditions, ECF No. 9-2, ¶ E.3.a.(7), p. 20. In support of its argument, Hamilton cites to a single case in which the Michigan Court of Appeals held that the insurer was entitled to summary disposition where its insured failed to timely submit an SSPOL, a condition precedent to suit: "In this case, it is undisputed that plaintiffs did not, *at any time* after the loss and before filing suit, submit to defendant a sworn proof of loss." Mot. at 15 (quoting *Alekson v. Auto-Owners Ins. Co.*, 2018 WL 2222734 (Mich. Ct. App. May 15, 2018)) (emphasis added).

Here, by contrast, Midland did submit multiple SSPOLs which sought payment for damage to the building and building personal property. Hamilton argues that, because Midland did not submit an SSPOL for business income or extra expense, Midland failed to meet the

condition precedent to suit. As Midland points out, however, its obligation to submit an SSPOL is triggered by Hamilton's request for an SSPOL. Hamilton has furnished no evidence that it requested an SSPOL with respect to business income loss or extra expense after Midland notified Hamilton of that loss. According to Chancellor Shick, not only did Hamilton fail to ask for a SSPOL with respect to business income loss or extra expense, but Hamilton in fact told her that they would not pay for such loss because it is "not tangible." Shick Aff. ¶ 5-6, ECF No. 15-3. Hamilton cannot maintain that Midland was obligated to submit an SSPOL in order to preserve its claim for business income and extra expense. Indeed, Hamilton's communication to Midland suggested that submitting an SSPOL would be futile.

Nor has Hamilton furnished any legal authority for the proposition that Midland is barred from making additional claims after submitting an SSPOL.[4] Hamilton also does not address the distinction between *Alekson* (in which no SSPOL was ever submitted) and the facts of this case. Hamilton has not met its summary judgment burden on this issue. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## C.

Hamilton also argues that Midland does not have a viable claim for loss of Business Income, Extra Expense, or Extended Business Income under the policy language. The "Business Income" provision of the policy provides as follows:

> We will pay for the actual loss of Business Income, including "Rental Value", you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations.

---

[4] Midland apparently submitted a total of three SSPOLs over the course of several months following Hamilton's request. Shick Aff. ¶ 7.

Policy p. 7, ECF No. 9-2. "Suspension" is defined in the policy as "[t]he slowdown or cessation of your business activities." *Id.* p. 26. Hamilton contends that Midland did not suffer a "slowdown or cessation" because it "was able to remain open for business at the same level as it did-pre-accident" and was "was able to deliver all of the days and hours of previously-scheduled classroom instruction to its students during the 2015-2016 schoolyear." Mot. at 17-18.

In support of its restrictive interpretation of the policy language, Hamilton cites to *Commstock*, in which the court concluded that the insured had suffered no business income loss where it identified no evidence that its business premises were partially or completely closed. *Commstop v. Travelers Indem. Co. Connecticut*, No. CIV.A. 11-1257, 2012 WL 1883461, at *12 (W.D. La. May 17, 2012). The "Business Income" provision of the *Commstop* policy was nearly identical to the provision in Midland's policy: "We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration." *Id.* at *1. As Plaintiff points out, however, the *Commstop* policy defined "suspension" to include "the *partial or complete cessation* of your business activities" whereas the Midland policy defined "suspension" as "[t]he *slowdown* or cessation of your business activities." *Id.* (emphasis added).

Thus, Midland does not need to demonstrate that it suffered a "cessation" of business activities, only a "slowdown." Here, there is evidence that Midland suffered both. As Hamilton acknowledges, "Midland closed the school for three days as a result of the loss." Mot. at 4. Hamilton does not consider this a "cessation" because Midland was able to use three State-authorized "forgiven" days.[5] *Id.* Irrespective of the fact that the state excused the three missed

---

[5] "Forgiven time" is the colloquial term used to describe missed days of instruction that the State excuses under certain circumstances, per MCL 388.1701(4): "Except as otherwise provided in this subsection, the first 6 days or the equivalent number of hours for which pupil instruction is not provided because of conditions not within the control of school authorities, such as severe storms, fires, epidemics, utility power unavailability, water or sewer

days, the school closing plainly constitutes a cessation of business activities. As Hamilton explains, "the insured's 'business activities' is the teaching of students." *Id.* For three days, Midland ceased teaching students.

Additionally, there is evidence that Midland suffered a "slowdown" in its business activities as well as a loss of business income. Chancellor Shick testified that the "spring student headcount in February 2016 reflected a level of attrition which automatically reduced the level of funding [for the existing student year for the 25e program] and for the foundation allowance which would be issued later in the following educational year of 2016-2017." Shick Aff. ¶ 9. Again, as noted by Hamilton, "the insured's 'business activities' is the teaching of students." Mot. at 4. In the Spring 2016 semester, Midland had fewer students to teach than the previous semester. If the term "slowdown" is to have any meaning at all under the policy, surely it must cover such a situation.

### D.

Pursuant to the Business Income provision, "the 'suspension' must be caused by direct physical loss of or damage to property at premises which are described in the Declarations." Accordingly, the next question to consider is whether there is a sufficient causal connection between the accident and the slowdown in business activities. Hamilton contends there is no such evidence other than the coincidental timing of the accident and the timing of the student attrition. Midland contends otherwise, emphasizing the testimony of Carole Crary, who was a teacher at the school. Ms. Crary testified as follows:

> A variety of contractors were working in the building after the accident which created noise and disruptions. Initially, asbestos remediation signs were posted by contractors and a plastic curtain wall extended across the main hallway

---

failure, or health conditions as defined by the city, county, or state health authorities, shall be counted as hours and days of pupil instruction." *See* ECF No. 9-11.

near my classroom for many months. Class locations had to be re-arranged throughout the building including for example my classroom moving to the math classroom and the math class moving to the band room.

The classroom materials I utilize in my class included hundreds of books stored along the perimeter walls, as well as unique objects and visual aids. The materials were sent out for cleaning and were not timely returned until the end of the year. During the November 2015 to June 2016 time period I had five classes to prepare for and I had to use at least two or more extra hours each week to seek out replacement curriculum materials to keep up with instructional requirements. This task not only interfered with my allotted prep time but frequently extended beyond available prep time. Over time, the process interfered with the progress of normal instruction and timely grading.

When some of the curriculum materials were back from cleaning at the end of the school year, the materials were returned in trailers and not unloaded by contractors. During my unpacking, it was determined that not all the materials [were] cleaned or returned. I spen[t] over six eight-hour days putting things back together and determined many items returned could not be used due to inadequate cleaning or remained missing. This occurred during a time that students were getting ready for year-end testing.

All of the foregoing factors significantly interfered with the consistency of the instruction. Which was an impact observed and realized by students and parents.

Crary Aff. ¶ 4-7. This evidence is sufficient for a reasonable jury to determine that the students who withdrew between the date of the accident and the end of the spring 2016 semester did so in some measure because of the accident.

As for the 2016-2017 school year, the causal connection is more remote. Because Midland has not identified any evidence that the disruption persisted into the following school year, a reasonable jury could not conclude that the students who withdrew in the 2016-2017 school year did so because of the accident.

Moreover, the policy language precludes recovery for business income loss in the 2016-2017 school year. The Extended Business Income provision provides:

If the necessary "suspension" of your "operations" produces a business income loss payable under this policy, we will pay for the actual loss of Business Income you sustain during the school term following the date the property is actually repaired, rebuilt or replaced, *if that date is 90 days or less before the scheduled opening of the next school term.*"

Policy p. 7 (emphasis added). The parties have differing opinions as to the precise time at which the property was "actually repaired, rebuilt, or replaced." Hamilton contends that this took place on April 21, 2016, when Midland received its Certificate of Occupancy from the Fire Marshall. Mot. at 5 (citing Shick Dep. at 174:4-12).[6]

Midland counters Hamilton's argument alleging that the classroom was not fully restored at that time because of the "absence of restored technology and the return of all class equipment and materials," and "because additional work had to be conducted by an electrical contractor." Resp. at 2. In support of this assertion, Midland cites to the affidavits of Ms. Crary and Ms. Shick.

Ms. Shick testified that the last day of the marking period for the 2015-2016 school year was June 10, 2016, and the first day of the following term was September 6, 2016 (89 days later). Shick Dep. at 221-222, ECF No. 9-6. Ms. Crary's affidavit states that "[t]he materials were sent out for cleaning and were not timely returned *until the end of the year*." Crary Aff. ¶ 5. ECF No. 15-2. It is not clear whether she was referring to the end of the 2015 calendar year or the end of the 2015-2016 school year. If she was referring to the latter, it is not clear that she is describing a precise date (i.e. the last day of the school year on June 10) or referring to a general time frame. Midland offers no explanation of Ms. Crary's testimony. Indeed, Midland does not even cite to a specific portion in the affidavit to support its argument that the classroom was not fully restored until less than 90 days prior to the start of the next term. Midland's bare citation to the affidavit fails to satisfy its burden to identify evidence supporting its claims. *See* Fed. R. Civ. P. 56(c) ("A

---

[6] It is undisputed that the beginning of the Fall 2016 semester was substantially more than 90 days following the issuance of the Certificate of Occupancy April 21, 2016. Ms. Shick testified that the first day of the 2016 term was September 6, 2016. Shick Dep. at 221-222, ECF No. 9-6. Thus, June 9, 2016 is the operative date under the Extended Business Income provision (90 days prior to the start of the school term on September 6).

party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to *particular parts* of materials in the record . . .") (emphasis added).

Midland's citation to Ms. Shick's affidavit falls short as well. Midland does not identify or cite to a specific portion of the affidavit, leaving the Court to guess at which portion of the affidavit Midland believes demonstrates a genuine issue of fact. At paragraph 4, Ms. Shick testified as follows:

> As I testified in deposition, the affected Academy premises including classroom of Ms. Carole Crary was not fully repaired and restored *by the date of the April 21, 2016* Fire Marshall's issuance of an occupancy permit. The repair and restoration work also required the subsequent involvement of Blasy Electric during the month of May 2016 and thereafter in August 2016, evidence of which is in the email communications between the parties.

Shick Aff. ¶ 4, ECF No. 15-3. First, Ms. Shick states that the premises were not restored as of the Fire Marshall's issuance of the occupancy permit on April 21, 2016. The date, however, was 138 days prior to the start of the 2016 term on September 6. In other words, the property could have been restored after April 21, but still more than 90 days prior to September 6, thereby precluding coverage for Extended Business Income. This does not demonstrate a legitimate question of fact. At this stage, Midland must identify affirmative evidence that supports its assertions. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Ms. Shick also testified that Blasy Electric performed work in May 2016 and August 2016. Shick Aff. ¶ 4. Midland also relies in part on the Blasy Electric invoices. Neither the affidavit nor the invoices demonstrate a material question of fact. The first invoices contain the following description of work performed: "Remove ceiling tile installed hardware and mounting plate for a customer supplied projector, removed existing receptacle from the ceiling tile and installed the receptacle in the new projector plate, power and data are at this location, just need mounting and hardware for drop ceiling." ECF No. 15-8. Even assuming this electrical work was

- 16 -

necessary for the classroom to be operable, the invoice notes that the work was completed on May 24, 2016, which is more than 90 days prior to the start of the school term.

The second invoice is dated August 9, and describes the work as follows: "Installed (2) VGA Cables and a VGA Selector for a Projector." Based on the evidence identified by Midland, the installation of these cables and selector is the only work that was performed on the classroom after June 9 (the operative date for the purposes of Extended Business Income coverage). This electric work alone does not establish a genuine issue of fact as to whether the property was not "actually repaired, rebuilt or replaced" until after June 9. Midland argues that the "Extended Business Income losses sustained . . . are payable to the extent that property which was subject of the initial claim is not repaired, rebuilt, or replaced within 90 days of the start of the next term." Midland's application of this theory would potentially justify nearly unlimited coverage.

It might be debatable whether the property was fully "repaired, rebuilt, or replaced" as of the Fire Marshall's issuance of the certificate of occupancy on April 21. However, Midland has not identified a material issue of fact where the only restoration effort that took place after June 9 was the installation of VGA Cables and VGA selector. There is insufficient evidence that the installation was necessary for the classroom to be operable. Moreover, there is insufficient evidence that VGA Cables and Selector were items of Business Personal Property that were the subject of their initial claim.

Next, Midland contends that, "through June 2016, Carole Crary was still devoting substantial time to her efforts to find replacements for curriculum materials that had not yet been 'repaired, rebuilt, or replaced.'" Resp. at 13. Again, disregarding Rule 56(c), Midland offers a general citation to the affidavit as a whole with no effort to identify the portion of the affidavit that supports the assertion. Midland appears to be referring to the testimony at paragraph five, in

which Ms. Crary testified that she was seeking out replacement curriculum materials "[d]uring the November 2015 to June 2016 time period." This testimony refers to a time period, not to a specific date. Again, June 9 is the operative date for the purposes of the extended business income coverage as it is 90 days prior to the start of the next term on Sept. 6. Ms. Crary did not testify that her classroom materials were not replaced until after June 9.

Midland's non-specific citation to the "Crary Affidavit" might also have been intended to refer to the testimony at paragraph 6, in which Ms. Crary testified that she determined "at the end of the year" that some of the classroom materials were missing or unusable. Later on in the same paragraph, however, she testified that "this occurred during a time that students were *getting ready for year end testing*." (emphasis added). This additional testimony reflects that, when Ms. Crary referred to the "end of the year" she was referring to a general time frame that likely preceded June 10 (the last day of school). Presumably, students would not be preparing for year end testing on the last day of school. Thus, this testimony does not establish that the classroom materials were missing or unusable as of June 9 or later.

Finally, Midland asserts at page 12 of its brief that "Ms. Shick testified in her deposition, that resumption of the restored use of the property was 90 days or less before the scheduled opening of the next school term." Resp. at 12. Here, Midland must be responsible for its obligation pursuant to Rule 56(c), which requires citations to "particular parts of materials in the record." The deposition is 308 pages long. Midland did not cite to a specific page number, nor did they even attach the relevant portions of it to their response (the deposition is in fact an exhibit to Defendant's response). Midland has not met its burden under Rule 56(c).

To summarize, Ms. Crary's testimony in conjunction with the timing of the accident is sufficient to demonstrate a question of fact as to the existence of a causal connection between the

accident and the attrition that took place through the Spring 2016 semester. If a sufficient causal connection exists, the loss flowing from that attrition is compensable under the policy language as Business Income loss. The evidence is insufficient, however, to demonstrate a question of fact as to the causal connection between the accident and the student attrition that took place after the conclusion of the Spring 2016 term. Moreover, the Extended Business Income policy provision precludes recovery for that period of time, as discussed above.

**E.**

Hamilton also argues that Midland did not incur a recoverable "Extra Expense" for media, printing, advertising, and related communications. The Extra Expense provision of the policy provides as follows:

3) Extra Expense

Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.

We will pay Extra Expense (other than the expense to repair or replace property) to:

(a) Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and cost to equip and operate the replacement location or temporary location.
(b) Minimize the "suspension" of business if you cannot continue "operations"

We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage.

Policy p. 7. The only argument Hamilton advances to support its position that Midland did not incur a recoverable Extra Expense is that Midland did not sustain a suspension of business

activities. For the reasons set forth in section II.C. above, the Court disagrees with that conclusion. Accordingly, Hamilton has not met its burden on this point.

**F.**

Finally, Hamilton argues that Midland intentionally misrepresented that 63 students withdrew from the school. Mot. at 23–25. Hamilton contends that this intentional misrepresentation voided the policy. Section A under Commercial Property Conditions reads as follows:

> This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:
> 1.     This Coverage Part
> 2.     The Covered Property
> 3.     Your interest in the Covered Property; or
> 4.     A claim under this Coverage Part.

Commercial Prop. Conditions p. 1, ECF No. 9-2. In short, the parties appear to have starkly different views about the number of students who withdrew.

Hamilton relies on the "Claire-Gladwin" records which Hamilton contends "indisputably document that Midland Academy's FTE student population decreased by 6 students during *the 2015-2016 term*, not 63." Mot. at 25 (emphasis added). Earlier in the brief, Hamilton specified that the "*October 2015 FTE* count for Midland was 205 and the *February 2016* count was 199, equating a total drop in FTEs during the restoration period of 6 students." Mot. at 6 (emphasis added). Hamilton is inconsistent with the manner in which it describes the relevant time period. October 2015-February 2016 certainly does not encompass the "2015-2016 term" and it is not at all clear why Hamilton chose that particular range of dates when calculating Midland's student attrition. Moreover, Hamilton's citations to the "Claire-Gladwin" records are unsupported by any citation to a particular page ID number. It is also unclear what the "Claire-Gladwin" records are,

where they came from, or what information they provide that Midland's "Skyward" reports do not include.

Midland's attempt to calculate student attrition is equally ineffective. Midland contends that, during the spring and summer 2016 term, it experienced an attrition rate that was "in number and percentage, unsurpassed in the history of the Academy" citing a reduction of "98 students who did not renew for the fall of 2016." Resp. at 2. Later on in the brief, Midland states that "in March of 2017, Plaintiff informed General Agency . . . that approximately (7) students (grade 5-7) and their siblings left the Academy *before* April 7, 2019, and that approximately twenty-nine (29) students *and their siblings*[7] left or did not return [between 6/11/16 and 9/16/16] for the next school year." It is unclear how these numbers are consistent with its earlier estimate of 98 students, or the estimate submitted to Hamilton of 63 students. Midland relies on the "Skyward withdrawal reports," which are lengthy reports containing numerous data points. The significance and meaning of these data points is not immediately apparent. Moreover, much like Hamilton, Midland cites to these reports as a whole, with no specific citation. Midland also neglects to explain what these reports are, where they came from, or what information they provide that Hamilton's "Claire-Gladwin" reports do not provide.

Because the parties' briefing on this issue does not facilitate intelligible analysis by the Court, supplemental briefing will be ordered.

## G.

Midland separately moves for appraisal (ECF No. 19) pursuant section E of the policy (Loss Conditions) which provides as follows at paragraph 2:

---

[7] It is unclear what Midland intended to communicate here. Are these "siblings" also students at Midland Academy? Are they included in the 29? If so, why are they separately identified as "siblings" of students and not simply as "students." In other words, if it is somehow significant that some of the students are siblings, that significance has been lost on the Court.

> If we and you disagree on the amount of the Net Income and operating expense or the amount of the loss, either may make a written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense or amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

ECF No. 19-2.

Hamilton argues that Midland has waived the right to appraisal by not timely seeking it. If the appraisal provision does not apply, the parties also disagree on how net income ought to be determined. Midland is of the opinion that its net income per student is exactly equal to the amount the state pays for each student ($7,391). Midland argues that all of its costs are fixed costs and not variable costs. In other words, Midland contends that their costs of doing business are unaffected by a change in student population. Hamilton has a decidedly different view.

Hamilton also contends that Midland is not entitled to an appraisal because it has not sustained a covered business income loss.[8] As discussed above, the Court disagrees with Hamilton's conclusion. The business income loss due to attrition is potentially recoverable through the spring 2016 semester. It is recoverable to the extent that student attrition is attributable to the accident.

The motion for appraisal will be held in abeyance, as will the issue of net income calculation. Before net income can be determined (by an appraiser or otherwise), the antecedent question of whether Midland has sustained *any* covered loss of business income must be addressed. This, in turn, depends on 1) the number of students who withdrew between the date of

---

[8] Hamilton does not, however, appear to dispute that appraisal is the contractual method for determining Net Income if appraisal is timely sought and if the insured has sustained a covered loss of business income.

the accident and the end of the spring 2016 semester; and 2) the extent to which that student attrition is attributable to the accident.

There is, at a minimum, a question of fact as to whether the student attrition is attributable to the accident. The issue of how many students withdrew is not, however, an issue about which reasonable minds can disagree. And yet, there is disagreement. The parties have offered estimates ranging from 6 to 98 students. The parties will be directed to submit supplemental briefing addressing the number of students who withdrew between *the date of the accident and the end of the spring 2016 term*. The briefing should not exceed 10 pages. The briefing should not include lengthy introductions, factual summaries, or procedural histories. The briefing should include specific citations to any exhibits. The briefing should also explain the information sources the parties are relying on.

## IV.

Accordingly, it is **ORDERED** that Hamilton's motion for summary judgment, ECF No. 9, is **GRANTED** in part and **DENIED** in part, as set forth above.

It is further **ORDERED** that Midland's motion for appraisal, ECF No. 19, is **HELD IN ABEYANCE**.

It is further **ORDERED** that the parties are **DIRECTED** to submit supplemental briefing as directed above. Midland's supplement brief is due on **December 28, 2018**. Hamilton's supplemental brief is due on **January 11, 2019**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: December 11, 2018